J-A03015-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: I.B.T.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: S.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1230 MDA 2020 |

Appeal from the Order Entered September 9, 2020
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s): ADOPTEE 69-2018

BEFORE: LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:           **FILED APRIL 09, 2021**

S.L. (Mother) appeals from the order involuntarily terminating her parental rights to her daughter, I.B.T.L. (Child), born in March of 2013.[1] The termination petition was filed by R.D., who stood *in loco parentis* to Child, and simultaneously filed a report of intention to adopt. After careful consideration of both the record and pertinent legal authority, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Mother gave birth to Child while incarcerated at the State Correctional Institution (SCI) at Muncy. N.T., 7/8/19, at 18. Days after Child's birth, Mother consented to Lock Haven Hospital discharging custody of Child to R.D., a woman Mother met through the Lighthouse Prison Ministries program. ***See***

---

[1] In the same order, the orphans' court involuntarily terminated the parental rights of Child's father, L.T., who has not appealed.

*id.* at 18, 46; **see also** Petition for Termination, 9/24/18, Exhibit A. The program required R.D. to take Child to the prison to see Mother every other week, and to return Child to Mother upon her release. *Id.* at 20, 59. In April of 2014, Mother was released to a halfway house in Philadelphia, where she remained for approximately six months. *Id.* at 19, 39-40. Mother testified that at the time of her release, she "wasn't in a position to take" Child, and she "explained that to" R.D. *Id.* at 20. R.D. testified it was not her intention to retain custody of Child after Mother's release in April 2014, but she initiated a custody action at that time because Mother "could not give any information as to what she was doing with [Child]" and "had no plan for [Child] when she got out." *Id.* at 60-62, 75.

On April 30, 2014, the court in the custody matter[2] issued an order providing that "Mother shall have supervised periods of physical custody, supervised by [R.D.], no less than four hours every other Sunday, with the parties alternating the location of the visits between Sunbury and Philadelphia." *Id.* at 93.

The custody court modified the April 30, 2014 order in an *interim* order dated July 1, 2014. *Id.* The *interim* order continued to grant Mother partial

_____

[2] The orphans' court had no involvement in the custody litigation, and was not sitting in the Northumberland County Court of Common Pleas at that time. The orphans court subsequently and accurately stated, "that's not what's in front of me at this point. That was dealt with by the [c]ourt. Rulings were entered. Orders were entered. The issue before the [c]ourt today is should [Mother's] rights be terminated?" N.T., 8/25/20, at 11.

physical custody, supervised by R.D. for no less than four hours every other Sunday, but specified that the visits were to occur at the Burger King in Sunbury. *Id.* The order also required R.D. and Mother to provide one another with "current address and telephone number and in the event of any change shall notify the other party of the same within three (3) days of such change." Further, the order provided, upon praecipe of either party, that a custody hearing be scheduled after paternity of Child was established. Mother filed a praecipe in 2016.[3] N.T., 7/8/19, at 26. A conciliation conference was scheduled for July 11, 2016, but Mother did not appear. *Id.* at 26-27. Mother later explained she had been "really sick" at the time due to "a bad pregnancy." *Id.* at 27. Mother's praecipe was dismissed, and the July 1, 2014 *interim* order remained in effect during the more than four years that followed. *Id.* at 27. On September 24, 2018, R.D. filed the underlying petition for termination of parental rights.

Mother testified that she sought to modify the July 1, 2014 custody order when she received the "termination papers." N.T., 7/8/19, at 28. She stated, "I reached out to this courthouse the same month that I received the papers in the mail that she was trying to terminate my rights. And I reached out to the courthouse to mail me papers for a modification." *Id.* Mother said the

---

[3] Mother confirmed she changed attorneys from Attorney Schwartz to Attorney Musselman. N.T., 7/8/19, at 26-27.

papers "never came." *Id.* She clarified, "I thought the papers [were] coming, but it was her termination papers." *Id.*

The orphans' court made the following inquiry:

THE COURT: You said that you did not receive the paperwork regarding a request for modification of the custody order after you contacted the courthouse?

[MOTHER]: Um hum.

THE COURT: Did you ever contact them again to ask for the paperwork?

[MOTHER]: No, because when I received the paper that she was trying to terminate my rights, that's when I thought that was the paperwork. And I just got distracted from then.

*Id.* at 34.

R.D. petitioned for termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (6), and (b); she also filed a report of intention to adopt. An evidentiary hearing commenced July 8, 2019. At that time, Child was six years old and had completed kindergarten. *See* Addendum to GAL Report and Recommendation, 7/2/19, at 3.

R.D. testified, and presented the testimony of Mother, as-on-cross, and Nancy Morgan, Child's mental health therapist. Mother testified on her own behalf, and also presented the testimony of Nancy Morgan. In addition, Mother presented the testimony of Kathleen Lincoln, Esquire, the guardian *ad litem* (GAL) as well as Child's Legal Counsel, and the court admitted into

evidence Attorney Lincoln's reports dated November 19, 2018 and June 30, 2019.[4]  Mother also presented testimony from her fiancé, K.B.

At the conclusion of the hearing, the orphans' court first addressed R.D., and then Mother, stating:

> I'm not second guessing the orders that were entered in the custody case.  The orders are there.  They're not appealed from.  They remain in effect, et cetera.  But it doesn't sit well, let's just say that.  This doesn't sit well.
>
> But the fact remains, [Mother], that it ultimately falls back on you to do whatever you can do, within reason, with reasonable firmness, and assertiveness, to exercise your parental rights, whether it is convenient or not.  You didn't do that.

N.T., 7/8/19, at 125.

_____

[4] The orphans' court appointed Attorney Lincoln as GAL and Child's Legal Counsel.  Attorney Lincoln testified Child "has consistently stated she wants to stay with [R.D.], that she understands [R.D.] would be adopting her, to the best of her ability to understand that.  And she does not want to leave here.  That is what she has consistently said to me."  N.T., 2/18/20, at 70.  **See In re Adoption of L.B.M.**, 161 A.3d 172, 174 (Pa. 2017) (plurality) (concluding 23 Pa.C.S.A. § 2313(a) mandates appointment of counsel for children involved in contested involuntary termination of parental rights proceedings); **In re T.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("during contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."); **In re Adoption of K.M.G.** 219 A.3d 662, 670 (Pa. Super. 2019) (*en banc*) (while this Court has authority to raise *sua sponte* issue of whether the trial court appointed any counsel for the child, it does not have authority to *sua sponte* review "whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding"), *aff'd* 240 A.3d 1218 (Pa. 2020).

The court detailed its finding that R.D. had met her statutory burden under 23 Pa.C.S.A. § 2511(a)(1). N.T., 7/8/19, at 119-124. With respect to 23 Pa.C.S.A. § 2511(b), the court stated, "the issue then becomes the bonding issue . . . I can't say that there is a bond or not. I think it behooves the [c]ourt in this circumstance to have a bonding assessment. *Id.* at 124. On July 30, 2019, the court appointed Michael Gillum, M.A., a licensed clinical psychologist, to perform a bonding assessment.[5]

On February 18, 2020, the court convened a hearing on Child's needs and welfare under § 2511(b). R.D. presented the testimony of Mr. Gillum, and the court admitted into evidence his reports dated October 14, 2019 and February 10, 2020. *See* N.T., 2/18/20, at 10-11 (Exhibits 1 and 2). R.D. testified, and the court admitted into evidence the "visit log" she prepared documenting Mother's visits with Child. *Id.* at 40, 45 (Exhibit 3). In addition, R.D. presented the testimony of Nancy Morgan, Child's mental health therapist, and the GAL. Mother testified on her own behalf, and presented the testimony of her sisters, L.B. and B.C. At the conclusion of the hearing, the

_____

[5] After the bonding assessment, R.D. filed a petition for special relief requesting the court terminate contact between Mother and Child pending further hearing, based on Mr. Gillum's statement that Mother's "behavior in visitations may be problematic based on the hostility expressed toward [R.D.]. . . . Verbalizations to Child may be inappropriate as well." Bonding Assessment, 10/14/19, at 10-11. The orphans' court granted the petition on October 21, 2019.

orphans' court stated that upon receipt of the transcript from the July 8, 2019 hearing, it would schedule a time to issue its decision on the record. N.T., 2/18/20, at 132.

On August 25, 2020,[6] the orphans' court convened, and began by stating there had been no argument "regarding the issue of bonding," and that it "would be happy to entertain argument at this point" from the GAL/Legal Counsel, Mother's counsel and R.D.'s counsel. N.T., 8/25/20, at 3. The GAL/Legal counsel, *inter alia*, opined that "while there is a connection between [Mother] and the child as far as their biography [*sic*], the relationship and the bond between [Mother] and the child is not so strong as to adversely affect the child should Your Honor terminate [Mother's] rights." ***Id.*** at 4. Conversely, Mother's counsel argued against termination, asserting that Mother "has attempted to preserve th[e] bond"; Mr. Gillum's bonding assessment was "fatally defective"; and Child's "interests will not be advanced" by termination. ***Id.*** at 5. In contrast, R.D.'s counsel credited Mr. Gillum's assessment in advocating for termination, and also referenced the

_____

[6] At the beginning of the hearing, the orphans' court noted the matter had been scheduled for August 5, 2020, but did not occur due to an unexpected medical emergency. N.T., 8/25/20, at 2-3. We also take notice of the delay caused by the COVID-19 pandemic, and the statewide judicial emergency declared by the Pennsylvania Supreme Court on March 16, 2020, and the President Judge of Northumberland County on March 18, 2020. ***See*** Northumberland County Administrative Order, AD-20-3; ***see also***, Order, 3/25/20 (continuing the parties' March 31, 2020 hearing "in light of public and health advisories regarding Coronavirus (COVID-19)").

recommendation of the GAL/Legal Counsel. *Id.* at 8-9. Counsel emphasized, "let us not lose focus on who this is really affecting. It's [Child]." *Id.* at 8. Counsel cited evidence of the strong parent/child bond between Child and R.D., as well as evidence that termination would serve Child's needs and welfare and not be detrimental to Child. *Id.* at 8-10. Thereafter, the orphans' court discussed the evidence, addressed counsels' arguments, and articulated its reasoning for entering the termination order. *See id.* at 10-16.[7]

On September 17, 2020, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On September 22, 2020, the court filed an opinion referencing its reasoning set forth in the notes of testimony from July 8, 2019 and August 25, 2020. Mother and R.D. have both filed briefs, and the GAL/Legal Counsel has advised this Court she would not file a brief, "which would be redundant to the position and brief of [R.D.]. I fully support the trial court ruling and the position on appeal of [R.D.] as submitted by brief." Letter, 12/3/20.

## ISSUES

On appeal, Mother presents the following issues for review:

1.      Did the [orphans'] court err[] and abuse its discretion in determining that [R.D.] presented clear and convincing evidence

---

[7] Although the order is dated August 25, 2020, it was docketed September 9, 2020.

that [Mother]'s parental rights should be terminated pursuant to 23 Pa.C.S. § 2511(a)(1), § 2511(a)(2) and § 2511(a)(5)[?][8]

2.      Did the [orphans'] court err[] and abuse its discretion in determining that [Mother] did not have a bond with [C]hild and relied upon a bond analysis that was deficient and did not pay most attention to the effect on [C]hild of permanently severing the parental bond?

3.      Did the [orphans'] court err[] in finding that [Mother]'s conduct warrants termination of her parental rights where the testimony established that [M]other made reasonable efforts toward the reasonably prompt assumption of her full parental responsibility based on [M]other's resources and circumstances available to her at the time of her attempt to reunite with [C]hild?

4.      Did the [orphans'] court err[] in failing to give priority consideration to the developmental, physical and emotional needs and welfare of [C]hild in terminat[ing] [Mother]'s rights and failing to recognize that terminating [M]other's rights would also terminate [C]hild's relationship with siblings in [M]other's custody?

Mother's Brief at 5-6.

CONTROLLING LAW

In reviewing Mother's issues, we are particularly mindful of and

emphasize the following:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

[8] R.D. did not allege grounds for termination under Section 2511(a)(5), and the orphans' court did not terminate Mother's parental rights under this subsection.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Termination is governed by the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Pertinently, Section 2511 states:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

>> . . .

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 10 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008) (citation omitted).

Our Supreme Court has stated: "Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child <u>and</u> refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child <u>or</u> fails to perform parental duties." **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 91 (Pa. 1998) (emphasis in original) (citation omitted). In addition, this Court has stated,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light

of the totality of the circumstances, clearly warrants the involuntary termination.

***In re B.,N.M.,*** 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

We further opined:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. **A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship**. **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.**

***In re B.,N.M.***, ***supra*** (citations omitted) (emphasis added).

A court must consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child," before analyzing Section 2511(b). ***In re Z.S.W.***, ***supra*** (quoting ***In re Adoption of Charles E.D.M.***, ***supra*** at 92). With respect to Section 2511(b), "Intangibles

such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

<u>GROUNDS FOR TERMINATION – § 2511(a)(1)</u>

As to Section 2511(a)(1), Mother argues in her first and third issues that the orphans' court erred in finding by clear and convincing evidence that she refused or failed to perform her parental duties. Mother states:

> From the birth of [C]hild to the filing of the [p]etition to [t]erminate, the parental duties which Mother was allowed to perform were dictated to her initially by her incarceration status and upon her release [from prison] by the Court of Common Pleas of Northumberland County. The [c]ourt itself dictated to this uncounseled Mother that she travel every other weekend for four hours of supervised visits between July of 2014 and throughout the entirety of this litigation up until the announcement of the termination which occurred on August 25, 2020. Even the [orphans'] court acknowledged that use of bus transportation between Philadelphia and Sunbury would be problematic. To place time restrictions and contact restrictions on Mother and then use lack of sufficient contact as a basis for termination is circular logic at best and smacks of fundamental unfairness. It also rewards R.D. for her duplicitousness and complete lack of cooperation with Mother during this entire process.

Mother's Brief at 16-17 (record citations omitted). After careful review, we are not persuaded by Mother's argument.

First, we note that contrary to Mother's assertion, she was not "uncounseled."[9] We also disagree that the orphans' court based its decision regarding grounds for termination under Section 2511(a)(1) on Mother's conduct while incarcerated or on parole. Likewise, we disagree that the court faulted Mother for not performing parental duties that she was incapable of performing under the July 1, 2014 custody order. Rather, the record reveals that the court very much examined Mother's conduct based on the circumstances of this case, including Mother's rights and limitations prescribed in the July 1, 2014 custody order.

---

[9] Mother testified on direct examination:

> Q. Do you remember an attorney by the name of Sue Schwartz?
>
> A. Oh, Ms. Schwartz; yes, I do. I kept in contact with her a lot. I do remember Ms. Schwartz.
>
> Q. And at least at some point during the custody litigation, did you retain private counsel? Did you hire an Attorney Musselman?
>
> A. Yes.
>
> Q. What was the purpose in having Attorney S[ch]wartz and Attorney Musselman represent you during the custody case?
>
> A. Oh, to get my daughter back.

N.T., 7/8/19, at 22.

We also find no error in the court's consideration and weight attributed to R.D.'s failure to return Child to Mother when Mother was released from prison in 2014. Mother describes R.D.'s actions as "duplicitous" and a "manipulation of the system." *See* Mother's Brief at 13 ("The court put little, if any, weight into the manipulation of the system [by R.D.]."). The record belies this claim.

The orphans' court **did** consider R.D.'s actions. For example, the court stated that while it was not "second guessing the [2014 custody] orders . . . they don't sit well, let's just say that. This doesn't sit well." N.T., 7/8/19, at 125. The court also stated: "I have my concerns about all of that, but that's not what's in front of me at this point." N.T., 8/25/20, at 11. Nonetheless, examining the facts of record in the context of the applicable law, the court found Mother failed to perform parental duties "for a period of at least six months immediately preceding the filing of the petition." 23 Pa.C.S.A. § 2511(a)(1). The court considered the "whole history of the case," and "examined the individual circumstances" to "determine if the evidence, in light of the totality of the circumstances," warranted termination. *In re B.,N.M.,* 856 A.2d at 855. Neither the orphans' court nor this Court condones R.D.'s actions insofar as she repudiated her agreement to return Child to Mother in 2014. However, the orphans' court explained:

> We are literally years beyond when [R.D.] first came into custody of [Child]. We are years beyond when [Mother] got out of [SCI] Muncy, left the halfway house. [S]o whatever happened in 2013, when [R.D.] first was given physical custody, not by the [c]ourt,

- 15 -

but by [Mother], and what the motivations were, are outside the purview of this [c]ourt.

There are existing court orders in a custody case in this county that control the circumstances. [Mother] had no idea what they really said. She thought she was only entitled to visits for two hours. In fact, the order says at least four. She thought that the orders said every other weekend alternating between Philadelphia and Sunbury. An order that was in effect for two months said that. But the subsequent order said that the visits were to occur only in Sunbury for no less than four hours.

***

**The . . . issue here is what [Mother] has and has not done to exercise her parental rights. And the long and short of it is not much. Whatever impediments are placed in the way of a parent to exercise their parental rights have to be met with reasonable firmness.** Very honestly, I can't remember the exact phrase that is used, but a parent can't sit back and say boy, they're not being cooperative, I should have more access to my kids. A parent has to put forth regular concerted efforts to . . . establish and/or maintain contact with a child. At the very least if there is an ongoing custody case, one would think that the parent who is complaining about their access to their child being defeated, would know what the [c]ourt order says. Two hours. [Mother] says I was supposed to have the child for two hours, and was supposed to alternate between Philadelphia and then Sunbury. It is at least four hours — at least four hours of supervised visits. And ultimately since July of 2014, the visits were supposed to be in Sunbury.

Now, what efforts has [Mother] made? Her testimony was that [R.D.] would not come to Philadelphia, and she was under no obligation to after July 1 of 2014. So what efforts did [Mother] make to get up to Sunbury. Well, she said she took the bus two or three times. And she initially said I don't know, maybe around ten visits plus or minus by being brought by her fiancé[]. But maybe it was more than that when I pressed her on it. And I said okay, let's say 20. And then what was interesting is when [K.B., Mother's fiancé] testified, he testified that he thinks he brought her up here 6 to 10 times. So if we credit him, we are back to around the ten times. That is 13 visits in a five-year period. Even if they all occurred prior to the filing of the petition to terminate,

- 16 -

that is 13 visits in a four year period. **So on average, three times a year to come up.**

[Mother]'s testimony, I think the indefiniteness of her testimony, raises some concerns. I don't think she really knows the answers to some of the questions. Sometimes she would say that. **I'm more persuaded by the testimony of [R.D.] regarding the frequency of the visits. The frequency of the contact.** It is not enough for [Mother] to say I reached out to the courthouse and they didn't send me the paperwork for a modification. Well, you reach out again. And then you reach out again. And then you reach out again until you get the paperwork if you're truly fighting for the physical custody of your daughter.

Yes, it is a problem to get a bus from Morrisville[10] or Philadelphia to Sunbury, but it can be done. It can be done. Maybe you only do it on average once a month as opposed to every other week.

Do I think that [R.D.] was cooperative with you? No, I don't. I don't. Do I think that is enough to justify [Mother's] lack of effort? No, I don't.

In [R.D.]'s petition to terminate, . . . [she] allege[s] that [Mother] has failed to perform parental duties, and has evidenced a settled purpose to relinquish her parental rights to the child for a period exceeding six months, in that [M]other has had almost no contact with the minor child, nor provided for any care or financial assistance of [C]hild since her birth [in] March [of] 2013.

. . . [Mother] did testify that she sent some books and a doll. [R.D.] confirmed that. But we don't find [Mother]'s testimony credible regarding birthday cards every year, et cetera. . . .

. . .

So we're down to really whether [Mother] failed to perform parental duties and/or evidenced a settled purpose to relinquish her parental role. For all intents and purposes, what [Mother] has done is said she is my daughter, I carried her for nine months, I want her.

_____

[10] Mother testified she lives in Morrisville, Bucks County. N.T., 7/8/19, at 7.

She doesn't know the . . . name of [C]hild's school, doesn't know her teacher's name. There was no evidence that she ever asked [R.D.] about any medical issues. . . . But medical issues, mental health issues, there is no testimony of any of that, of any normal inquiries. No testimony of well, I asked [] about how kindergarten was going. There was no testimony of that. It was, I want my child when I want her, and I want her because she's my child. That doesn't do it.

So I think [R.D.] has demonstrated by clear and convincing evidence that for a period of at least six months immediately preceding the filing of the petition, [Mother] has . . . refused and failed to perform parental duties.

N.T., 7/8/19, at 119-124 (emphasis added).

The record supports the court's findings.[11] For example, Mother testified, "I thought [visitation with Child] was two [hours]. But I thought [R.D.] was supposed to be in Philadelphia. I thought we had to share." N.T., 7/8/19, at 13. When the court asked Mother why she thought visits for the past five years were to alternate between Philadelphia and Sunbury, she responded: "Well, that is the information I heard. I don't know. . . ." *Id.* at 94.

---

[11] We review Mother's performance of parental duties up through and including September of 2018, the month in which she received notice of the filing of the involuntary termination petition. *See* 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

Mother also testified in response to questioning by the orphans' court as follows:

Q. Ma'am, you testified that you came two or three times on the bus visits, how many times did your fiancé[] bring you here?

A. [He] brought me here . . . more than I rode the bus.

THE COURT: How many times ballpark?

[MOTHER]: Maybe ten, a little over ten, more than ten.[12]

THE COURT: You said you took the bus two or three times from Philadelphia, and that was early on after you got out of the halfway house?

[MOTHER]: Yes.

THE COURT: Is that correct?

[MOTHER]: Yes.

THE COURT: And then you had approximately ten trips where your fiancé[] brought you up?

[MOTHER]: It could have been — I'm pretty sure it was more than ten, Your Honor.

THE COURT: Ma'am, your testimony is a moving target. One minute you say . . . you're on SSI, then you say you're on SSD.

. . .

THE COURT: Another moment you said that you hadn't worked since 2002, now it is 2012. You said approximately ten, maybe a little more, and now it is suddenly ten. Let's say it is 20. Let's say your fiancé[] brought you up here 20 times. When do you and your fiancé[] get [together]?

_____

12 Mother's fiancé, K.B., testified he brought Mother to see Child "between six to ten" times. N.T., 7/8/19, at 105.

[MOTHER]: When I was in the halfway house.

THE COURT: So sometime in 2014. So approximately five years ago?

[MOTHER]: Yes. About five years ago.

THE COURT: So if we have 20 visits that he has brought you up, and three visits that you came up on the bus, that's 23 visits where you have come up here in the past five years. That's fewer than five visits per year on average when you have come up here. So that is fewer than one visit every two months.

. . .

THE COURT: So you have had 23 visits in the last five years.

[MOTHER]: Yes. And I wish I had more, Your Honor.

N.T., 7/8/19, at 91-96.

R.D. testified that Mother did not visit Child in 2014; Mother had three visits in 2015; Mother had one visit in 2016; Mother had no visits in 2017; and Mother had one visit in July of 2018. N.T., 7/8/19, at 51-52. She also testified Mother did not visit Child between February 2016 and July of 2018. *Id.* at 52.

Mother refuted R.D.'s claim that she did not visit Child in 2017. She testified she visited Child "[a] couple" of times in 2017. *Id.* at 30. With respect to how many times she visited between January and September of 2018, Mother testified, "[a] couple." *Id.* at 31. Mother stated, "I never went a whole six months without visiting" Child. *Id.*

Mother also testified about R.D.'s lack of cooperation:

- 20 -

Q. [H]ow would you describe [R.D.]'s level of cooperation in accommodating visits?

A. She made it kind of hard. She could have made it a little easier for me.

Q. What would she do?

A. I would ask her — if I couldn't make it on a Sunday, I would say, well, could I come on Friday? No. She will say no. [Child] is in school, which [Child] is not in school all day, I stated to her. She just wasn't having it.

N.T., 7/8/19, at 23.

On cross-examination, R.D. responded to questions concerning her cooperation as follows:

Q. When [Child] is less than 13 months old, we already have problems between you and [Mother] as far as her perception that you're interfering with her bonding with her daughter?

A. Yes.

Q. Do you have any reason why [Mother] would come to the conclusion?

A. Because [Mother] doesn't do anything. [Mother] wants everyone to do everything else. [Mother] made no attempt to come around. [Mother] made no attempt to call. No phone number. I couldn't even tell you [Mother]'s address. . . . [Mother] gives no information. How am I supposed to help them bond when there is no meeting place? She wants to wait until the last minute. There is no phone number given. There is no way to get a hold of her.[13]

---

[13] R.D. testified that in May of 2014, when the custody order required the parties to alternate visits between Philadelphia and Sunbury, she did not take Child to Philadelphia because Mother "refused to give an address. [Mother] refused to give a phone number. . . . [Mother] called me the day of and asked me why I wasn't there. . . . I'm not going to guess where she's at. I

Q. How did you attempt to resolve that with [Mother]? What did you do as far as working with her to get her child back to her?

A. Nothing. You can't work with [Mother].

Q. You can't work with [Mother]?

A. No. No one can work with [Mother].

N.T., 7/8/19, at 68-69.

The orphans' court further questioned Mother:

THE COURT: How often did you call [Child]?

[MOTHER]: I call [Child] almost every day.

. . .

THE COURT: Beginning when?

. . .

[MOTHER]: Everyday I could, that I was allowed to talk to her.

THE COURT: At what point did you begin your almost every day phone calls; when you were in SCI Muncy, after you got out, when you were in the halfway house, after you got out? When?

[MOTHER]: Well, I couldn't call her when I was in Muncy.

THE COURT: That's what I'm asking.

[MOTHER]: So when I came into the halfway house, I kept in touch with [R.D.]. It was more [R.D.] than [Child].

. . .

THE COURT: How many birthday cards have you sent to [Child]?

_____

had no clue where she was. Mother doesn't give any information to know anything." N.T., 7/8/19, at 67-68.

- 22 -

[MOTHER]: Six. She is six years old. I sent six.

THE COURT: [Y]ou indicated that most of your contact was with [R.D.,] not [Child]; how frequently would you speak with [Child]?

[MOTHER]: **It wasn't really frequent, only because I was going through something.** But I made sure I kept in contact with [R.D.] a lot to check on [Child]. When I started to feel better, yeah, I started to talk to [Child]. But [R.D.] knew everything that was going on with me because I kept in contact with her. I thought she was a friend.

THE COURT: Is there a reason you don't know [Child]'s school name?

[MOTHER]: I asked [Child] what school she goes to.

THE COURT: Is there a reason you don't know what that is?

[MOTHER]: I didn't remember what [Child] told me, but I asked her.

*Id.* at 35-37 (emphasis added).

After careful review, we find the record supports the court's determination that Mother evidenced a settled purpose or refused or failed to perform her parental duties under Section 2511(a)(1).

### NEEDS AND WELFARE – § 2511(b)

In her second and fourth issues, Mother argues the orphans' court abused its discretion in finding that termination served the developmental, physical, and emotional needs and welfare of Child. Mother asserts that the court erred because "there was some type of relationship between Mother and [C]hild. . . ." Mother's Brief at 19. Mother claims the court "must be reversed since Mother successfully established a relationship." *Id.* at 20. To

support this argument, Mother assails the assessment by the psychologist, Mr. Gillum. Mother maintains the assessment was not credible because Mother's relationship with Child was "limited by the custody litigation order allowing for very limited contacts in an artificial setting. . . ." *Id.*

We review Mother's argument mindful of the following:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, **it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child**. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [**I**]**n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have** with the foster parent. Additionally, this Court stated that **the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child**.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (emphasis added).

Our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their [custodial] parent[]."

- 24 -

*In re T.S.M.*, 71 A.3d at 268.  The Supreme Court directed that in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind."  *Id.* at 269.  The Court continued: "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.  When courts fail . . . the result, all too often, is catastrophically maladjusted children."  *Id.*

Mr. Gillum provided the following opinion on direct examination:

[Child] had really no bond to [Mother].  She was extremely bonded to [R.D.].  . . .  [R.D.] and [Child] have a very strong bond, very typical parent-child type of bond.  With [Child] and [Mother] there is not much of a bond developed.

N.T., 2/18/20, at 6-7.  Mr. Gillum explained the basis for his opinion as follows:

Because . . . having spoken with [Child] about encouraging her to make phone calls or to talk to [Mother], and having her reject that idea and put up some resistance to me.  And having observed her being told by [R.D.] that she needed to call and not wanting to call.  I also based it on [Child] telling me that she doesn't feel comfortable with [Mother].  She's not sure how to interact with her.  She gets very anxious. . . .

Then in the observations of [Child] with [Mother], each observation I went to essentially they started out by eating a meal sitting at the same booth, where [Child] was on the inside.  And then as the meal starts to finish, both times I observed there was a very intense conversation going on between [Mother] and [Child].  They both looked very somber and very serious.  And then a short time after that [Child] was up and pretty much running around the restaurant for the rest of the visit and she essentially would avoid [Mother].  She would come around the other side of the restaurant, set up shop with whatever she was playing with, and hang out over there.  She really didn't return when she was asked to return.

So I think what she tells me and what I observed . . . what I observed in that environment twice now . . . I think she is very

- 25 -

reluctant to have much of anything to do with [Mother], whether it's a phone call or visit. I don't think that's going to change. I think she has obviously, you know, been very well bonded to [R.D.] pretty much her whole life, with [Mother] coming in much later in her life and trying to build a bond with her.

*Id.* at 7-8.

With respect to whether it would be detrimental to Child to terminate Mother's parental rights, Mr. Gillum testified:

I think [Child] would probably feel some relief. She's been very anxious about this issue for a long time. I'm sure her therapist can speak to that better.

In any case, I think she'll be very relieved. I don't see her experiencing any damage because there just was no bond built to disrupt.

*Id.* at 9.

In his report dated October 14, 2019, Mr. Gillum opined, "Any attempt to place Child outside of her current home would certainly result in severe emotional trauma. Even if the brief period of consistent visitation were to be extended (with consistent utilization of all visitation time allotted), it is extremely unlikely [Child]'s intense bond with [R.D.] would be diminished." Bonding Assessment, 10/14/19, at 10.

Nancy Morgan, a mental health therapist, testified she has been treating Child for "[a]bout three years" due to behavioral issues. N.T., 2/18/20, at 51-52. Ms. Morgan stated that she and Child "would talk about her behaviors of acting out with [R.D.] after visitations" with Mother. *Id.* at 55. Ms. Morgan continued:

- 26 -

And what we find is that when children are dealing with a traumatic event, they will test their bond with their primary caregiver to ensure that — that they are unconditionally loved. And so [Child] was doing that through behaviors such as, defecating in her room, intentionally spilling quantities of items on the bathroom floor, throwing things.

*Id.* at 55-56. Ms. Morgan responded to questioning with respect to whether Child would suffer any harm if Mother's parental rights were terminated:

Q. Have you seen anything within your counseling with [Child] that would cause you any hesitation or any concerns — that there is a bond between [Child] and [M]other that would cause you any concern if the [c]ourt were to terminate her rights?

A. No.

Q. Through your counseling have you observed any type of bond [Child] has with [R.D.]?

A. Very strong. [R.D.] is her primary connection and her person that she trusts without question.

*Id.* at 57-58.

R.D. presented the testimony of the GAL concerning two reports the GAL filed with the court, and in which she recommended that Child "remain with [R.D.], that the rights of the parent be terminated." N.T., 2/18/20, at 67. The GAL explained:

[Child] has consistently stated to me, I believe she understands that Ms. [] is her biological mommy. She refers to her — it's in my initial report. She referred to her as, "I was in her belly." So when I was trying to ascertain if she really understood the difference, that's how she described [Mother,] she referred to her as [S___] Mommy many times, but she also refers to [R.D.] as Mommy.

She's very well-connected here. It's pretty much the only lifestyle that she has known since her birth. She has reported that she is

anxious if she has to leave here. She doesn't want to live anywhere else.

*Id.* at 67-68.

On cross-examination by Mother's counsel, the GAL testified that she perceives Child is "fearful" that she will eventually be living with Mother. *Id.* at 71.

The GAL testified with respect to Child's preference as follows:

[T]he last time I spoke to [Child] was right around the holidays, and she has consistently stated that she wants to stay here with [R.D.], that she understands that [R.D.] would be adopting her, to the best of her ability to understand that. And she does not want to leave here. That is what she has consistently said to me.

The other thing that [Child] has consistently said is she does not want to talk to [Mother] on the phone. I asked her why, why doesn't she want to do that. She said she gets very confused about what [Mother] says to her. She says stuff — [Mother] says stuff to her, to [Child] that she doesn't understand. She doesn't like that [Mother] tells her that [R.D.] is not her family. That confuses her and makes her feel bad.

*Id.* at 70. The GAL also testified on cross-examination by Mother's counsel, "Child has consistently expressed that she does not want to have a relationship with Mother." *Id.* at 74. In sum, the testimony of Mr. Gillum, Ms. Morgan, and the GAL, as well as their reports either entered as exhibits or filed on the record, support the court's conclusion that termination serves Child's needs and welfare.

Finally, we are not persuaded by Mother's emphasis on "the demographics involved," given that Child, Mother and Child's biological half-siblings are African American, while R.D. is white, such that termination would

cause Child to be "culturally isolated." Mother's Brief at 23-24. Mother attempts to discredit Mr. Gillum's bonding assessment because he did not observe Child with her half-sisters who live with Mother. Mother also asserts that the bonding assessment was deficient based on the following testimony by Mr. Gillum:

> Q. In preparation of this particular report did you review any literature or consult with any experts on the impact of multi-racial adoption on this child would have?
>
> A. Not beyond myself, no.
>
> Q. You didn't think that was necessary?
>
> A. No. I didn't think it was necessary at all.

N.T., 2/18/20, at 17.

Mother claims Mr. Gillum's failure to "address the multi-racial aspect of this case" constituted a "critical deficiency." Mother's Brief at 23. Mother contends the orphans' court "unreasonably concluded from the facts before it that termination was in [C]hild's best interest" and asks this Court to "correct this error." Mother's Brief at 25. Mother cites no legal authority to support this claim, and like the orphans' court, we are not persuaded by this argument.

Mr. Gillum was charged with assessing the bond between Mother and Child, and R.D. and Child — not the impact of multi-racial adoption. The orphans' court commented at length:

> The only testimony we had about the issue of race was limited testimony on cross of [M]r. Gillum. …

- 29 -

There was no testimony – and [Counsel for Mother], I understand what you're saying. I understand the concerns you're raising in your arguments. But there is no testimony before the [c]ourt offered by anyone that race alone is enough to decide this case which is in effect I think what you're doing.

Mr. Gillum's testimony was that there is no bond.

… [Child's] counselor – Miss Morgan indicated there was no bond.

The Guardian Ad Litem I believe the testimony was there was some bond, but certainly not one to an extent that [Child] would suffer any damage as a consequence of the termination of parental rights of [Mother].

I can't jump – go past that to say we're dealing with a child of color, and therefore one shouldn't break whatever bond there may be between that child of color and a mother of color.

The [c]ourt has no knowledge of what the ethnicity, race, whatever, of the father is. I think that kids get – [Child] is, what, six?

[MOTHER'S COUNSEL]: Seven, Your Honor.

\*\*\*

I've received no testimony that it is, per se, better that a child be raised by a parent or parents of their own race or ethnicity. Maybe, if everything else was equal, but I don't know because I have no – I have no testimony.

. . . I don't think we can . . . jump to the conclusion that it must be better for [Child] to be raised by her biological mother because her biological mother shares at least part of her ethnicity, as opposed to being raised by [R.D.].

Let's go back to why we're here. The issue is whether there's a bond. Mr. Gillum testified at Page 9 of the transcript of February 18th that not only was there no bond, but that he thought [Child] would be relieved if she did not have to interact with [Mother] any longer.

At Page 30 Mr. Gillum acknowledged there are times when a parent who has been out of the child's life and is coming back

into the child's life may be able to and does in fact establish a bond. He did not see that occur or be in the process of occurring in this case.

***

[Mother] did not do all that she could. She did not demonstrate reasonable firmness in the face of adversity. She did not extend herself and do all she could or even very honestly close to all that she could to create a bond or any portion thereof with [Child].

***

Miss Morgan testified about [Child's] behavior degrading after there were visits with [Mother]. That is hardly indicative of a bond.

Miss Morgan also testified that there was no evidence – that she saw no evidence of a bond. That was page I believe 57 between [Child] and [Mother].

I believe it was Miss Morgan at page 74[14] – Miss Morgan testified – as her counselor says that "[Child] has consistently expressed that she does not want to have a relationship with [Mother]."

Do I like everything about this factual situation and what I've heard in this testimony? No. But that's not what's relevant. What's relevant is based on the evidence presented – and I previously found as I indicated – that [Mother] demonstrated a settled purpose to relinquish her parental rights by her inactivity basically, or lack of activity, lack of effort.

Again, . . . there is no evidence of a bond that was presented to this [c]ourt, a bond existing between [Mother] and [Child].

And therefore, the [c]ourt will enter an order terminating [Mother's] parental rights. Thank you.

---

[14] It was not Miss Morgan, but the GAL/Legal Counsel who testified [Child] "has consistently expressed that she does not want to have a relationship with [Mother]." N.T., 2/18/20, at 74.

N.T., 8/25/20, at 12-16.

Upon review, we find the record supports the orphans' court's factual findings and credibility determinations. *In re T.S.M.*, 71 A.3d at 267. The record also demonstrates that the orphans' court properly applied the law in deciding that clear and convincing evidence supported termination under 23 Pa.C.S.A. § 2511(a)(1) and (b). Thus, we find no error of law or abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/09/2021